# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| DARIEN FROESS, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR** |
| | **VIOLATIONS OF THE FEDERAL** |
| v. | **SECURITIES LAWS** |
| CARDLYTICS, INC., KARIM TEMSAMANI, and ALEXIS DESIENO, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiff Darien Froess ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Cardlytics, Inc. ("Cardlytics" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Cardlytics; and (c) review of other publicly available information concerning Cardlytics.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired Cardlytics securities between March 14, 2024 and August 7, 2024, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Cardlytics operates an advertising platform in the United States and the United Kingdom. It offers the Cardlytics platform, a proprietary advertising channel that analyzes anonymized purchase data received primarily from financial institutions to help marketers reach potential buyers. Through these campaigns, consumers are incentivized to purchase from a marketer during a specified period,

and Cardlytics funds these consumer incentives using a portion of the fees collected from marketers. The Company's Ads Decision Engine ("ADE") is a tool that helps marketers identify and target consumers with relevant ads.

3.      On May 8, 2024, after the market closed, the Company revealed that its first quarter 2024 revenue only increased 8% year-over-year, despite a 12% increase in billings, due to a 20.2% increase in consumer incentives.

4.      On this news, the Company's stock price fell $5.33, or 36.5%, to close at $9.27 per share on May 9, 2024, on unusually heavy trading volume.

5.      On August 7, 2024, after the market closed, Cardlytics released its second quarter 2024 financial results, revealing a 9% year-over-year *decrease* in revenue to $69.6 million, alongside a 3% decline in adjusted contribution to $36.4 million. The press release also disclosed that Karim Temsamani had stepped down as Chief Executive Officer and from the Board of Directors.

6.      On this news, Cardlytics' stock price fell $3.94, or 57.1%, to close at $2.96 per share on August 8, 2024, on unusually heavy trading volume.

7.      Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) increasing consumer engagement led to an increase in consumer incentives; (2) that the Company could not increase its billings

commensurate with the increased consumer engagement; (3) that, as a result, there was a significant risk that its revenue growth would slow or decline; (4) that the changes to ADE, which led to increased consumer engagement, led to the "under-delivery" of budgets and customers billing estimates; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

8.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

11.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of

materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

12.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## **PARTIES**

13.    Plaintiff Darien Froess, as set forth in the accompanying certification, incorporated by reference herein, purchased Cardlytics securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14.    Defendant Cardlytics is incorporated under the laws of Delaware with its principal executive offices located in Atlanta, Georgia. Cardlytics's common stock trades on the NASDAQ exchange under the symbol "CDLX."

15.    Defendant Karim Temsamani ("Temsamani") was the Company's Chief Executive Officer ("CEO") from September 2022 to August 2024.

16.    Defendant Alexis DeSieno ("DeSieno") was the Company's Chief Financial Officer ("CFO") at all relevant times.

17.    Defendants Temsamani and DeSieno (together, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

18.    Cardlytics operates an advertising platform in the United States and the United Kingdom. It offers the Cardlytics platform, a proprietary advertising channel that analyzes anonymized purchase data received primarily from financial institutions to help marketers reach potential buyers. Through these campaigns,

consumers are incentivized to purchase from a marketer during a specified period, and Cardlytics funds these consumer incentives using a portion of the fees collected from marketers. The Company's Ads Decision Engine ("ADE") is a tool that helps marketers identify and target consumers with relevant ads.

19.    According to Cardlytics, "billings is an important indicator for the current health of the business because it directly represents [its] ability to bill customers for [its] services before any Consumer Incentives are paid."

**Materially False and Misleading**

**Statements Issued During the Class Period**

20.    The Class Period begins on March 14, 2024. On that day, Cardlytics announced its fourth quarter and full year 2023 financial results in a press release for the period ended December 31, 2023.[1] The press release reported the Company's financial results, including a total revenue of $89.2 million, billings of $131.9 million, and adjusted contribution of $47.3 million. Specifically, the press release stated the following, in relevant part:

> "Achieving growth and improving our capital structure are our top priorities," said Alexis DeSieno, CFO of Cardlytics. "In 2023, we turned to full year positive Adjusted EBITDA for the first time since 2019, and our Q1 guidance implies further acceleration. We are on a path to double-digit billings growth in 2024 and positive operating cash flow on an annual basis."

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added, and all footnotes are omitted.

**Fourth Quarter 2023 Financial Results**

• Total Revenue was $89.2 million, an increase of 8.1% compared to $82.5 million in the fourth quarter of 2022.

• Billings, a non-GAAP metric, was $131.9 million, an increase of 4.6% compared to $126.1 million in the fourth quarter of 2022.

• Adjusted Contribution, a non-GAAP metric, was $47.3 million, an increase of $7.3 million compared to $40.0 million in the fourth quarter of 2022.

• Net Loss attributable to common stockholders was $(100.8) million, or $(2.56) per diluted share, based on 39.5 million weighted-average common shares outstanding, compared to a Net Loss attributable to common stockholders of $(378.3) million, or $(11.32) per diluted share, based on 33.4 million weighted-average common shares outstanding in the fourth quarter of 2022.

• Adjusted EBITDA, a non-GAAP metric, was $10.0 million, an increase of $16.1 million compared to $(6.1) million in the fourth quarter of 2022.

21.    On March 14, 2024, the Company submitted its fourth quarter and full year 2023 report for the period ended December 31, 2024 on a Form 10-K filed with the SEC, affirming the previously reported financial results (the "FY23 10-K"). The FY23 10-K purported to warn that the Company is "dependent upon the Cardlytics platform" without discussing budget delivery issues. Specifically, the FY23 10-K stated, in relevant part:

*We are dependent upon the Cardlytics platform.*

The majority of our revenue and billings during 2023 and 2022 were derived from sales of advertising via the Cardlytics platform. Our operating results could suffer due to:

• lack of continued participation by FI partners in our network or our failure to attract new FI partners;

• any decline in demand for the Cardlytics platform by marketers or their agencies;

• failure by our FI partners to increase engagement with our solutions within their customer bases, adopt our new technology and products, improve their customers' user experience, increase customer awareness, leverage additional customer outreach channels like email or otherwise promote our incentive programs on their websites and mobile applications, including by making the programs difficult to access or otherwise diminishing their prominence;

• our failure to offer compelling incentives to our FI partners' customers;

• FI partners may elect to use their Partner Share to fund their Consumer Incentives;

• the introduction by competitors of products and technologies that serve as a replacement or substitute for, or represent an improvement over, the Cardlytics platform, or an FI partner's decision to implement any existing or future product or technology of a competitor alongside, or in lieu, of the Cardlytics platform;

• FI partners developing, or acquiring, their own technology to support purchase intelligence marketing or other incentive programs;

• technological innovations or new standards that the Cardlytics platform does not address; and

• sensitivity to current or future prices offered by us or competing solutions.

***In addition, we are often required to pay Consumer Incentives before we receive payment from the applicable marketer.*** Accordingly, if we encounter any significant failure to ultimately collect payment, our business, financial condition and operating results could be adversely affected.

If we are unable to grow our revenue and billings from sales of the Cardlytics platform, our business and operating results would be harmed.

22.    The FY23 10-K also claimed that Cardlytics could improve engagement through certain investments, which negatively impacted revenue. Specifically, it stated:

We run campaigns offering compelling Consumer Incentives to drive an expected rate of return on advertising spend for marketers. At times, we may collaborate with a partner to enhance the level of Consumer Incentives to their respective customers, funded by their Partner Share. We believe that *these investments by our partners positively impact our platforms by making their customers more highly engaged with our platforms. However, these investments negatively impact our GAAP revenue, which is reported net of Consumer Incentives.*

23.    The FY23 10-K also purported to warn that its revenue growth may not be sustainable, stating:

*We may not be able to sustain our revenue and billings growth rate in the future.*

Our revenue increased 4% to $309.2 million in 2023 from $298.5 million in 2022 and increased 12% to $298.5 million in 2022 from $267.1 million in 2021. Our billings increased 2% to $453.4 million in 2023 from $442.5 million in 2022 and increased 12% to $442.5 million in 2022 from $394.1 million in 2021. We may not be able to maintain year-over-year revenue and billings growth in the near term or at all, and you should not consider our revenue and billings growth in any specific historical periods as indicative of our future performance. *Our revenue and billings may be negatively impacted in future periods due to a number of factors, including slowing demand for our solutions, increasing competition, decreasing growth of our overall market, inflationary pressure, our inability to engage and retain a sufficient number of marketers or partners, or our failure, for any reason, to capitalize on growth opportunities.* If we are unable to maintain consistent revenue, revenue growth or billings growth, our stock price

could be volatile, and it may be difficult for us to achieve and maintain profitability.

24.    The above statements identified in ¶¶ 20-23 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that increasing consumer engagement led to an increase in consumer incentives; (2) that the Company could not increase its billings commensurate with the increased consumer engagement; (3) that, as  a result, there was a significant risk that its revenue growth would slow or decline; (4) that the changes to ADE, which led to increased consumer engagement, led to the "under-delivery" of budgets and customers billing estimates; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

25.    The truth began to emerge on May 8, 2024, after the market closed, when the Company announced that first quarter 2024 revenue only increased 8% excluding Entertainment, despite a 12% increase in billings. This was due to a 20.2% increase in Consumer Incentives. Specifically, the Company issued a press release, stating in relevant part:

> "Our results in the first quarter reflect the progress we have made at delivering more value to both consumers and our advertising partners," said Karim Temsamani, CEO of Cardlytics. "***We are driving deeper engagement in the form of higher redemptions, demonstrating that***

*our investments are working, and signaling the potential for higher billings growth in the future*."

"Q1 was a good start to the year. We are seeing strong momentum in our international business and are making progress on our longer-term initiatives," said Alexis DeSieno, CFO of Cardlytics. "*Adjusted contribution, which reflects the money we keep after paying out rewards and partner share, grew 27%* excluding Entertainment, and we delivered another quarter of positive Adjusted EBITDA, in addition to making material improvement to our balance sheet."

## First Quarter 2024 Financial Results

• Revenue was $67.6 million, an increase of 5% year-over-year, or 8% excluding Entertainment.

• Billings, a non-GAAP metric, was $105.2 million, an increase of 10% year-over-year, or 12% excluding Entertainment.

• Adjusted Contribution, a non-GAAP metric, was $37.1 million, an increase of 20% year-over-year, or 27% excluding Entertainment.

• Net Loss was $(24.3) million, or $(0.56) per diluted share, based on 43.2 million fully diluted weighted-average common shares, compared to a Net Income of $13.6 million, or $0.40 per diluted share, based on 36.7 million fully diluted weighted-average common shares in the first quarter of 2023.

• Adjusted EBITDA, a non-GAAP metric, was a gain of $0.2 million compared to a loss of $(6.1) million in the first quarter of 2023.

| | Three Months Ended March 31, | | | | |
|---|---|---|---|---|---|
| | 2024 | 2023 | 2023 Results Excluding Entertainment[2] | Change % | Change % Excluding Entertainment[2] |
| Billings[1] | $ 105,216 | $ 95,626 | $ 93,876 | 10.0% | 12.1% |
| Consumer Incentives | 37,608 | 31,295 | 31,295 | 20.2% | 20.2% |
| Revenue | 67,608 | 64,331 | 62,581 | 5.1% | 8.0% |
| Partner Share and other third-party costs | 30,543 | 33,384 | 33,358 | (8.5)% | (8.4)% |
| Adjusted Contribution[1] | 37,065 | 30,947 | 29,223 | 19.8% | 26.8% |
| Delivery costs | 6,173 | 6,424 | 6,424 | (3.9)% | (3.9)% |
| Gross Profit | $ 30,892 | $ 24,523 | $ 22,799 | 26.0% | 35.5% |
| Net (Loss) Income | $ (24,275) | $ 13,608 | $ 14,751 | n/a | n/a |
| Adjusted EBITDA[1] | $ 226 | $ (6,091) | $ (5,639) | n/a | n/a |

26.     On this news, the Company's stock price fell $5.33, or 36.5%, to close at $9.27 per share on May 9, 2024, on unusually heavy trading volume.

27.     However, Defendants continued to issue materially misleading statements. During a conference call also held on May 8, 2024, an analyst noted that "the proportion of incentives has been in a pretty tight band that moved out of that band in this quarter." The analyst inquired "how that number moves so much in a quarter and if we need to rethink the ratio of redemption versus billings going forward." Defendant DeSieno replied that "***this is really a testament to the product changes we're making on ADE***, better targeting and optimization of our ranking capabilities . . . This is really driving higher engagement." The higher engagement was at a greater cost to the Company because, according to Defendant Temsamani, "[t]here's a timing difference here with regards to our teams being able to go back and get the budget in the timeframes that we're talking about." He assured that "longer term, it's very healthy for the program."

28.     On May 8, 2024, the Company submitted its first quarter report for the period ended March 31, 2024 on a Form 10-Q filed with the SEC, affirming the previously reported financial results (the "1Q24 10-Q"). The 1Q24 10-Q purported to warn that the Company is "dependent upon the Cardlytics platform" without discussing budget delivery issues. Specifically, the 1Q24 10-Q stated, in relevant part:

*We are dependent upon the Cardlytics platform.*

The majority of our revenue and billings during the three months ended March 31, 2024 and the full year of 2023 were derived from sales of advertising via the Cardlytics platform. Our operating results could suffer due to:

• lack of continued participation by FI partners in our network or our failure to attract new FI partners;

• any decline in demand for the Cardlytics platform by marketers or their agencies;

• failure by our FI partners to increase engagement with our solutions within their customer bases, adopt our new technology and products, improve their customers' user experience, increase customer awareness, leverage additional customer outreach channels like email or otherwise promote our incentive programs on their websites and mobile applications, including by making the programs difficult to access or otherwise diminishing their prominence;

• our failure to offer compelling incentives to our FI partners' customers;

• FI partners may elect to use their Partner Share to fund their Consumer Incentives;

• the introduction by competitors of products and technologies that serve as a replacement or substitute for, or represent an improvement over, the Cardlytics platform, or an FI partner's decision to implement any existing or future product or technology of a competitor alongside, or in lieu of, the Cardlytics platform;

• FI partners developing, or acquiring, their own technology to support purchase intelligence marketing or other incentive programs;

• technological innovations or new standards that the Cardlytics platform does not address; and

• sensitivity to current or future prices offered by us or competing solutions.

In addition, we are often required to pay Consumer Incentives before we receive payment from the applicable marketer. Accordingly, if we encounter any significant failure to ultimately collect payment, our business, financial condition and operating results could be adversely affected.

If we are unable to grow our revenue and billings from sales of the Cardlytics platform, our business and operating results would be harmed.

29.    The 1Q24 10-Q also purported to warn that revenue growth was not sustainable, stating in relevant part:

*We may not be able to sustain our revenue and billings growth rate in the future.*

Our revenue increased 5.1% to $67.6 million during the three months ended March 31, 2024 from $64.3 million during the three months ended March 31, 2023. Our billings increased 10.0% to $105.2 million during the three months ended March 31, 2024 from $95.6 million during the three months ended March 31, 2023. We may not be able to maintain year-over-year revenue and billings growth in the near term or at all, and you should not consider our revenue and billings growth in any specific historical periods as indicative of our future performance. *Our revenue and billings may be negatively impacted in future periods due to a number of factors, including slowing demand for our solutions, increasing competition, decreasing growth of our overall market, inflationary pressure, our inability to engage and retain a sufficient number of marketers or partners, or our failure, for any reason, to capitalize on growth opportunities.* If we are unable to maintain consistent revenue, revenue growth or billings growth, our stock price could be volatile, and it may be difficult for us to achieve and maintain profitability.

30.    The above statements identified in ¶¶ 25, 27-29 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to

investors: (1) that the Company could not increase its billings commensurate with the increased consumer engagement; (2) that, as a result, there was a significant risk that its revenue growth would decline; (3) that the changes to ADE, which led to increased consumer engagement, led to the "under-delivery" of budgets and customers billing estimates; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## **Disclosures at the End of the Class Period**

31.    On August 7, 2024, after market hours, Cardlytics released its second quarter 2024 financial results, revealing a 9% year-over-year ***decrease*** in revenue to $69.6 million and a 3% decline in adjusted contribution to $36.4 million. The press release quoted DeSieno, explaining that "slower-than-anticipated billings growth coupled with higher consumer incentives" had led to operational challenges. Specifically, the press release reported, in relevant part:

> "While we observed strong growth in redemptions, ***our results were challenged by slower-than-anticipated billings growth coupled with higher consumer incentives***," said Alexis DeSieno, CFO of Cardlytics. "We remain confident that our improved balance sheet continues to support investment in the business."
>
> **Second Quarter 2024 Financial Results**
>
> • Revenue was $69.6 million, a decrease of (9)% year-over-year, or (7)% excluding Entertainment.
>
> • Billings, a non-GAAP metric, was $110.4 million, an increase of 1% year-over-year, or 2% excluding Entertainment.

• Adjusted Contribution, a non-GAAP metric, was $36.4 million, a decrease of (3)% year-over-year, or an increase of 1% excluding Entertainment.

• Net Loss was $(4.3) million, or $(0.09) per diluted share, based on 49.1 million fully diluted weighted-average common shares, compared to a Net Loss of $(23.5) million, or $(0.67) per diluted share, based on 34.9 million fully diluted weighted-average common shares in the second quarter of 2023.

• Adjusted EBITDA, a non-GAAP metric, was a loss of $(2.3) million compared to a loss of $(4.1) million in the second quarter of 2023.

32.    In the same press release, the Company also disclosed that Defendant Temsamani had stepped down as CEO and from the Board of Directors.

33.    On the same day, the Company held an earnings call pursuant to its second quarter 2024 financial results. In that earnings call, DeSieno disclosed "[r]evenue decreased due to a combination of lower-than-anticipated billings, *largely due to under-delivery of budgets we have secured*, and higher-than-expected consumer incentive payments. Amit Gupta, the Company's current Chief Executive Officer, further disclosed "[t]his miss was driven by fast-paced changes to our technology platform, which led to unpredictable delivery of the advertiser budgets." When questioned by analysts, DeSieno admitted that these issues had been known "*[g]oing back a quarter or two*" and "this started with getting all the banks onto AWS and on the cloud so that we could be getting real-time data and pushing out updates to our product more real-time." Specifically, during the earnings call, the following statements were made, in relevant part:

[Alexis DeSieno]

Consumer incentives, which we refer to as rewards, increased by 25% to $40.8 million due to enhancements in ADE and more performance ad serving. Revenue, which is billings net of consumer incentives, but before partner share, was $69.6 million, a decrease of 7%. ***Revenue decreased due to a combination of lower-than-anticipated billings, largely due to under-delivery of budgets we have secured, and higher-than-expected consumer incentive payments***.

*          *          *

[Amit Gupta]: . . . We are not satisfied with our results, and we're taking proactive steps to address these challenges. We need to better monetize the value we deliver to our buyers, brands, and banks. That starts with better forecasting, delivery, and pricing, and delivering a platform that fully meets our advertisers' needs. Alexis will discuss the most recent quarter in greater detail in a few minutes. ***We missed our Q2 guidance, primarily due to a miss on top line related to delivery issues. This miss was driven by fast-paced changes to our technology platform, which led to unpredictable delivery of the advertiser budgets.***

We are actively addressing these issues in the second half. In the long run, these refinements to our platform, coupled with engagement-based pricing, will give us real-time data on campaign performance and enable us to optimize campaigns based on these signals to deliver better outcomes for buyers, brands, and banks.

*          *          *

Q [Analyst]:   Yeah. Hey, guys. Thanks for taking the question. Just wanted to touch on the delivery performance. ***When did you guys sort of start to notice these delays or disruptions,*** and kind of what are you doing to fix this, and how long do you expect this to be disrupting the business for?

A [Alexis DeSieno]: Yeah. Thanks for the question. ***I think you started to see this in the results going back a quarter or two.*** We alluded to the higher rewards last quarter, ADE has been a process we're doing a better job targeting, and t***his started with getting all the banks onto AWS and on the cloud so that we could be getting real-time data and pushing out updates to our product more real-time. With that is***

17

***coming some of this disruption,*** but basically, we're creating a more performant network. Some brands are performing much, much better than expected. Some are not, but overall, it's a more performant network, and that's what's leading to the higher rewards in the short term.

34.    On this news, Cardlytics' stock price fell $3.94, or 57.1%, to close at $2.96 per share on August 8, 2024, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

35.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Cardlytics securities between March 14, 2024 and August 7, 2024, inclusive , and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

36.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Cardlytics's shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Cardlytics shares were traded publicly during the Class Period on

the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Cardlytics or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

37. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

38. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

39. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Cardlytics; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

40.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

41.    The market for Cardlytics's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Cardlytics's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Cardlytics's securities relying upon the integrity of the market price of the Company's securities and market information relating to Cardlytics, and have been damaged thereby.

42.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Cardlytics's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they

failed to disclose material adverse information and/or misrepresented the truth about Cardlytics's business, operations, and prospects as alleged herein.

43.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Cardlytics's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## **LOSS CAUSATION**

44.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

45.    During the Class Period, Plaintiff and the Class purchased Cardlytics's securities at artificially inflated prices and were damaged thereby.  The price of the

Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

46.    As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Cardlytics, their control over, and/or receipt and/or modification of Cardlytics's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Cardlytics, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

47.    The market for Cardlytics's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Cardlytics's securities traded at artificially

inflated prices during the Class Period.  On March 25, 2024 the Company's share price closed at a Class Period high of $20.25 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Cardlytics's securities and market information relating to Cardlytics, and have been damaged thereby.

48.     During the Class Period, the artificial inflation of Cardlytics's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Cardlytics's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Cardlytics and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

49.     At all relevant times, the market for Cardlytics's securities was an efficient market for the following reasons, among others:

(a)    Cardlytics shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Cardlytics filed periodic public reports with the SEC and/or the NASDAQ;

(c)    Cardlytics regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    Cardlytics was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.   Each of these reports was publicly available and entered the public marketplace.

50.    As a result of the foregoing, the market for Cardlytics's securities promptly digested current information regarding Cardlytics from all publicly available sources and reflected such information in Cardlytics's share price. Under these circumstances, all purchasers of Cardlytics's securities during the Class Period suffered similar injury through their purchase of Cardlytics's securities at artificially inflated prices and a presumption of reliance applies.

51.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

52.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking

statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Cardlytics who knew that the statement was false when made.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and

### Rule 10b-5 Promulgated Thereunder

### Against All Defendants

53.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

54.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Cardlytics's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

55.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Cardlytics's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

56.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Cardlytics's financial well-being and prospects, as specified herein.

57.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Cardlytics's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Cardlytics and its business operations and future prospects

in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

58.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

59.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the

truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Cardlytics's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

60.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Cardlytics's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members

of the Class acquired Cardlytics's securities during the Class Period at artificially high prices and were damaged thereby.

61.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Cardlytics was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Cardlytics securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

62.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

63.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## **SECOND CLAIM**

### **Violation of Section 20(a) of The Exchange Act**

### **Against the Individual Defendants**

64.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

65.     Individual Defendants acted as controlling persons of Cardlytics within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

66.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

67.     As set forth above, Cardlytics and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants

are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: January 22, 2025

**HOLZER & HOLZER, LLC**

By: *_/s/Marshall P. Dees_*
Corey D. Holzer
Georgia Bar No. 364698
Marshall P. Dees
Georgia Bar No. 105776
Joshua A. Karr
Georgia Bar No. 202783
**HOLZER & HOLZER LLC**
211 Perimeter Center Parkway,
Suite 1010
Atlanta, Georgia 30346
Telephone: (770) 392-0090
Facsimile: (770) 392-0029
cholzer@holzerlaw.com
mdees@holzerlaw.com
jkarr@holzerlaw.com

*Liaison Counsel for Plaintiff Darien Froess*


**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@Glancylaw.com
      clinehan@Glancylaw.com

*Counsel for Plaintiff Darien Froess*